# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 24-0972V

|  |  |
|---|---|
| MARYLOU APRIL GRACIA,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: June 3, 2025 |

*Richard H. Moeller, Moore, Heffernan, et al., Sioux City, IA,* for Petitioner.

*Mary Novakovic, U.S. Department of Justice, Washington, DC,* for Respondent.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

On June 25, 2024, Marylou April Gracia filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges the Table claim of a shoulder injury related to vaccine administration ("SIRVA") due to a hepatitis B vaccine received on July 17, 2023. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

Respondent has filed his report contesting compensation on several grounds (ECF No. 12). I find that the record preponderantly supports a finding that the statutory severity requirement is met, that there is no other condition or abnormality that would explain

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Petitioner's post-vaccination symptoms, and that her pain was limited to the shoulder in which she received the vaccine. However, the record contains conflicting evidence as to whether the onset of Petitioner's right shoulder pain occurred within the timeframe set forth in the Vaccine Injury Table.

### I. Relevant Factual History

Petitioner received the vaccine alleged as causal in her right deltoid on July 17, 2023. Ex. 4 at 20. On August 18, 2023 – 32 days after vaccination – she saw nurse practitioner ("NP") Jacqueline Ellison complaining of right shoulder and upper arm pain. Ex. 5 at 71. She explained that her symptoms had "been present for about *a week*" – which would place the onset of her shoulder pain approximately *three weeks* after vaccination, far outside the 48-hour onset required for a Table SIRVA claim. *Id.* (emphasis added).

On examination, Petitioner had "[n]o limited ROM [range of motion] to either shoulder," although she had pain past 90 degrees extension in her right shoulder. Ex. 5 at 74. She was diagnosed with right shoulder tendonitis, with NP Ellison noting that Petitioner did "a lot of repetitive lifting and lowering all day long" at her job in a school that could cause her symptoms to flare up when the school year began. *Id.* Petitioner was given a muscle relaxer and prednisone. *Id.* She denied any injury, and did not mention her recent vaccination.

In late September 2023 (now almost two and a half months after vaccination), Petitioner saw Dr. Lisa Shepherd complaining of right arm pain. Ex. 5 at 66. Petitioner reported that the pain had "been present for >6 weeks" – suggesting an onset a month after vaccination, or some undefined point in time before that. *Id.* Petitioner did not recall a specific injury, and did not mention her vaccination. *Id.* Her pain radiated from her shoulder down her right upper arm. *Id.* On examination, Petitioner's right shoulder had painful abduction, tenderness to the distal deltoid insertion and bicep tendon insertion, pain with empty can testing, and positive apprehension testing results. *Id.* at 69. A shoulder x-ray was normal. *Id.* Petitioner was assessed with right upper arm pain and referred to physical therapy ("PT"), with Dr. Shepherd noting that she was developing decreased range of motion and at risk of developing adhesive capsulitis. *Id.* at 70.

The following week, Petitioner began PT.[3] Ex. 6 at 124. Petitioner now stated that her problem started in "July '23," without providing a specific date. *Id.* at 141. The onset date states "9/28/2023 date of the referral." *Id.* Petitioner now reported that she "developed R upper arm pain after having a hepatitis injection in July 2023." *Id.* at 125.

---

[3] The date of service on the record is October 6, 2023, but within the record the "date of evaluation" is listed as October 4, 2023. Ex. 6 at 124. For purposes of this Ruling, it does not matter which date is correct.

2

Although the record states that she "denies pain at the shoulder joint," Petitioner's treatment diagnoses were right shoulder pain and weakness. *Id.* at 125. She described the pain as a constant dull ache that she rated as nine out of ten. *Id.* On examination, she her right shoulder active range of motion ("ROM") was 120 degrees in flexion and 70 degrees in abduction and painful, while her left shoulder had full active ROM. *Id.* She had full passive ROM in her right shoulder. *Id.* The therapist determined that Petitioner had right biceps and wrist extensor strain resulting in pain that was limiting her active ROM and strength. *Id.* at 126. The therapist noted that Petitioner was at "[h]igh risk for frozen shoulder" due to her age and diabetes mellitus diagnosis. *Id.* at 124.

Petitioner saw Dr. Shepherd again on October 24, 2023, to follow up on chronic conditions and for her shoulder pain. Ex. 5 at 58. Petitioner stated that she had tried non-steroidal anti-inflammatory medications and PT, without relief. *Id.* On examination, Petitioner had decreased internal rotation in her right shoulder compared to her left, with positive results on the apprehension, Hawkin's, and empty can tests. *Id.* at 62. Dr. Shepherd ordered a right shoulder MRI, which showed tendinopathy, a superior labral tear, findings suggestive of adhesive capsulitis, trace joint effusion, soft tissue edema, and mild degenerative changes. Ex. 6 at 65-66.

On November 8, 2023, Petitioner saw an orthopedist for her right arm and shoulder pain. Ex. 6 at 258. For the first time – now nearly *four months* after vaccination – she reported "significant pain immediately following" her July vaccination, which "felt as if it hit the bone." *Id.* Since that time, she had pain over the deltoid radiating distally. *Id.* She had attended six PT sessions, without improvement. *Id.* On examination, Petitioner had positive impingement and O'Brien's testing results. *Id.* Her right shoulder ROM was 160 degrees in forward flexion, 150 degrees in abduction, and 45 degrees in external rotation. *Id.* She was assessed with right arm and deltoid pain, and another round of PT and an MRI of her right humerus were ordered. *Id.*

Petitioner returned to the orthopedist the following month, on December 6, 2023 – four months and 19 days after vaccination. Ex. 6 at 260. The humerus MRI was normal. *Id.* On examination, Petitioner had tenderness with palpation over the attachment of her right deltoid, with ROM of 160 degrees in forward flexion, 150 degrees in abduction, and 50 degrees in external rotation. *Id.* A steroid injection was administered, and home exercises were recommended as she was unable to do more PT due to insurance issues. *Id.* Petitioner was not a candidate for regular anti-inflammatory medications due to her diabetes. *Id.*

On February 27, 2024, Petitioner saw Dr. Shepherd for an annual wellness examination. Ex. 5 at 30. An examination of her extremities was "normal," with no cyanosis or edema. *Id.* at 34. The record is silent on any arm or shoulder concerns.

On March 14, 2024 – three months after her steroid injection and almost eight months after vaccination – Petitioner returned to the orthopedist. Ex. 8 at 9. The steroid

3

injection "help[ed] the majority of her symptoms for about 2 1/2 weeks." *Id*. Now, however, she had pain radiating down her deltoid, as well as "deep within the joint and axilla." *Id*. The pain at her deltoid attachment site had improved. *Id*. On examination, her right shoulder ROM was 150 degrees in forward flexion, 140 degrees in abduction, 50 degrees in external rotation, and 60 degrees in internal rotation, with positive impingement and O'Brien's testing. *Id*. Petitioner was diagnosed with right shoulder pain, bursitis, and labral tear. *Id*. The orthopedist thought she was also experiencing pain from adhesive capsulitis. *Id*. He recommended that she start PT again, although a repeat steroid injection and surgery were also discussed as options. *Id*.

Petitioner underwent a PT evaluation on April 1, 2024. Ex. 9 at 97. The onset date is listed as "7/2023," meaning at some unspecified time in July 2023. *Id*. Petitioner complained of stiffness, weakness, and pain of her right shoulder, and rated her pain as seven out of ten. *Id*. at 98. On examination, her right shoulder passive ROM was 130 degrees in flexion, and her active ROM was 110 degrees in flexion. *Id*. The therapist noted that her ROM was decreased compared to her October 2023 PT. *Id*. at 99.

Petitioner has submitted three affidavits in support of her claim. Exs. 1, 2, 3. Petitioner states in one that "[i]mmediately after the injection, I was experiencing pressure and pain in my shoulder where the injection was." Ex. 1 at ¶ 6. She asked the nurse why it hurt so much, and was told it was normal and would go away. *Id*. Instead, the pain worsened by the time she got home. *Id*. at ¶ 7. By dinner time, she did not feel well enough to make dinner as she usually did. *Id*. at ¶ 8. That night, it was painful to sleep on her right side, and the pain woke her during the night. *Id*. at ¶ 9. The next day, the pain was worse. *Id*. at ¶ 10. She recalled that the nurse said it would get better over time, and took Tylenol for pain relief. *Id*. at ¶ 11. Her husband had to help her around the house with things like carrying laundry, cleaning, and cooking. *Id*. at ¶ 13.

In early August 2023, Petitioner started to become concerned that her shoulder would cause problems when she returned to her job working in a school at the end of the month, so she went to NP Ellison. Ex. 1 at ¶ 16. Petitioner does not know why the record of this visit says that her symptoms had been present for a week, but asserts it is incorrect, explaining that she "would not have gone in after just a week." *Id*. She thinks that perhaps she referred to something else being present for a week, but she "know[s] I had been having pain since July 17, which would be about four to five weeks." *Id*. at ¶ 19. When the school year started, she told the school she could not return due to her right arm pain. *Id*. at ¶ 20. She adds that the December 2023 steroid injection "relieved a lot of my pain and made my shoulder better for about two to three weeks, and eventually wore off." *Id*. at ¶ 26.

Petitioner's husband, Moises Gracia, submitted an affidavit in support of her claim. Ex. 2. He recalls that when he got home from work on the day Petitioner received the vaccine in July 2023, Petitioner was already home and told him that her shoulder hurt a

lot and she was not up for doing anything. *Id.* at ¶ 5. He could see that she was in pain, and she was not moving or lifting her arm. *Id.* Most days when he gets home, Petitioner is already making dinner, and soon thereafter they eat. *Id.* at ¶ 10. On the day she received the vaccine, she had not yet started dinner. *Id.* That night, she could not sleep on her right side. *Id.* at ¶ 11.

Petitioner's adult daughter, Marisa Gracia, submitted an affidavit on her behalf. Ex. 3. Marisa lives on the same street as her parents and sees Petitioner almost every day. *Id.* at ¶¶ 2, 3. She and her mother go to a local thrift store almost every Monday at 4pm when it opens. *Id.* at ¶ 5. Petitioner received the vaccine on a Monday in July 2023, and on that day when Marisa arrived at Petitioner's house, Petitioner stated she could not go because she her arm was "hurting a lot" from a vaccine she received that day, and she could not move it without pain. *Id.* at ¶ 6. The following day, Petitioner told Marisa that her arm was worse, and she could not do things around the house. *Id.* at ¶ 9. It was painful to put on clothing or drive, and she could not lift or carry her four year old grandchild. *Id.*

## II. Respondent's Rule 4(c) Report

Respondent has filed his Rule 4(c) Report setting forth his objections to Petitioner's claim (ECF No. 12) ("Respondent's Report"). Respondent argues that Petitioner's claim does not satisfy the severity requirement because Petitioner stopped seeking care for her shoulder about four months and two weeks after vaccination (on December 6, 2023), and did not return to care for over three months later, or until March 14, 2024. Respondent's Report at *7. At the March appointment, she stated that the December steroid injection had been effective for two or three weeks – thus not providing an adequate explanation for the gap in care. *Id.* Additionally, her pain was now different, located "deep within the joint and axilla," while the pain at her deltoid attachment had improved. *Id.* And Petitioner has not offered an explanation for why she did not report shoulder pain at her February 2024 wellness examination. *Id.*

Respondent further contends that other Table SIRVA elements are not met. First, Respondent asserts that Petitioner has not preponderantly established a two-day onset of pain, emphasizing that at her first medical treatment over a month after vaccination she reported that her pain had been present for *one week*. Respondent's Report at *8. At her second appointment approximately two and a half months after vaccination, she imprecisely reported that her symptoms had been present for more than six weeks. *Id.* At neither of these appointments did she relate her pain to vaccination. *Id.* It was only at her PT evaluation over two and a half months after vaccination that Petitioner first mentioned vaccination in relation to her shoulder pain. *Id.* Although Petitioner has submitted affidavits asserting that she felt shoulder pain soon after vaccination, Respondent argues that these are not consistent with contemporaneous medical records and not sufficient to find in Petitioner's favor. *Id.* at *8-9.

5

Respondent also argues that Petitioner's records show a history of dysfunction and other conditions or abnormalities that would explain her symptoms, focusing on Petitioner's work, which required repetitive lifting and lowering, and her pre-existing diabetes, which along with her age put her at risk of shoulder problems. *Id.* at *9. And Petitioner's MRI showed a SLAP tear, which is "not attributable to vaccination." *Id.* Finally, Respondent asserts that Petitioner's symptoms were not limited to her vaccinated shoulder, emphasizing that she reported pain radiating into her right arm at two appointments, and at her October 2023 PT evaluation she reported upper arm pain and specifically "denied pain at the shoulder joint." *Id.* at *10.

### III.  Factual Finding

#### A. Severity Requirement

I find that Petitioner has preponderantly demonstrated that her symptoms continued for more than six months, and thus the statutory severity requirement is satisfied. Although Petitioner temporarily stopped seeking care for her shoulder pain after just over four and a half months, she resumed treatment three months later. Significantly, she temporarily stopped seeking care after receiving a steroid injection in December 2023. The medical records and Petitioner's affidavit indicate that the steroid injection provided significant pain relief for two to three weeks.

Respondent asserts that Petitioner's steroid injection does not fully explain the treatment gap, because it was only effective for two to three weeks. But it is not uncommon for a SIRVA petitioner to experience pain relief from a steroid injection and thus temporarily stop seeking medical treatment, only for the pain to return as the effects of the steroids wear off. *Sawyer v. Sec'y of Health & Human Servs.*, No. 19-1473V, 2023 WL 4505208, at *4 (Fed. Cl. Spec. Mstr. June 12, 2023) (finding severity requirement met where the petitioner received a steroid injection three and a half months after the onset of her shoulder pain, then did not seek care again for another four months, noting that her shoulder pain at that time was more likely a return of her SIRVA-related pain spurred by her steroid injection wearing off). That Petitioner reported significant pain relief of two to three weeks from the steroid injection does not mean that after three weeks her pain returned unabated. And if it did, this would *support* a finding that Petitioner experienced residual effects during the treatment gap – and support a finding in Petitioner's favor on the severity requirement.

Respondent's argument that Petitioner did not report shoulder pain at her February 2024 annual exam is more compelling. However, I note that Petitioner returned to her orthopedist just over two weeks later – suggesting that she planned to continue treating her shoulder condition with a specialist rather than her primary care physician. *See, e.g.*, *Gibson v. Sec'y of Health & Human Servs.*, No. 21-0392V, 2025 WL1483427 (Fed. Cl.

6

Spec. Mstr. Apr. 16, 2025) (primary care physician and neurologist submitted affidavits stating that SIRVA petitioner complained to them of shoulder pain, but they did not document it in their medical records because she was receiving treatment for that condition from an orthopedist). As such, Petitioner's failure to mention shoulder pain at her annual exam does not lead me to conclude that her shoulder pain was not present at this time.

### B. No Other Condition or Abnormality Would Explain Post-Vaccination Symptoms

Although Petitioner had pre-existing diabetes, and her work involved repetitive lifting and lowering, the record does not preponderantly support a finding that either of these would explain Petitioner's post-vaccination symptoms; nor would her age. Petitioner had worked at the same job for several months before vaccination, and in fact her shoulder pain began during summer break – at a time she was not working. Thus, her work duties would not explain her symptoms. And although she had pre-existing diabetes, Respondent has not cited any evidence that Petitioner had adhesive capsulitis or other shoulder conditions prior to vaccination. Thus, I find that her diabetes would not explain her post-vaccination symptoms.

Similarly, the fact that Petitioner's MRI showed a SLAP tear does not defeat her claim. Such underlying comorbid but asymptomatic conditions are frequently observed in the context of SIRVAs – and I would require a greater quantum of evidence to conclude that it is likely explanatory of her post-vaccination pain.

### C. Symptoms Were Limited to Shoulder

I also find that the record preponderantly supports a finding that Petitioner's symptoms were limited to her shoulder. Respondent cites records documenting radiating into Petitioner's right arm, and pain in her upper arm. Although Petitioner reported some pain radiating to her arm, her symptoms *primarily* occurred in, and originated from, her vaccinated shoulder. *See Valdez v. Sec'y of Health & Human Servs.*, No. 21-0394V, 2024 WL 1526536, at *6-7 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (finding third QAI satisfied despite pain radiating to upper arm and forearm because the petitioner *primarily* experienced a shoulder injury consistent with SIRVA).

And I do not see a meaningful distinction between a lay petitioner complaining of upper arm pain rather than shoulder pain. To someone without medical training, those terms refer to the same general anatomical area. *See Roberson v. Sec'y of Health & Human Servs.*, No. 21-2309V, 2025 WL 605724, at *7 (Fed. Cl. Spec. Mstr. Jan. 24, 2025) (acknowledging that people often speak in colloquial and imprecise terms when seeking medical attention). Furthermore, although the PT record Respondent relies on states that Petitioner reported upper arm pain while denying pain at the shoulder joint, the same record lists a diagnosis of right shoulder pain and weakness. Ex. 6 at 125. As such, I do

7

not interpret this record as supporting a finding that Petitioner's pain was not limited to her shoulder.

### D. Onset of Shoulder Pain

The record on onset is less clear. At Petitioner's first medical encounter for shoulder pain, the record suggests that her pain began *three weeks* after vaccination. At her next appointment, she stated that her pain had been present for more than six weeks – which could put onset approximately a month after vaccination, or at a time potentially even *before* vaccination. At neither of these appointments did Petitioner relate her pain to vaccination, or mention the vaccine at all.

On the other hand, at her October 2023 PT evaluation, Petitioner related her pain to her July 2023 vaccination. Even then, however, she did not assert that her pain began *immediately* after vaccination, instead vaguely stating that her pain began some time after vaccination in July 2023. Ex. 6 at 125.

It was not until Petitioner saw an orthopedist nearly four months after vaccination that she told a medical provider that her pain began *immediately* after vaccination. Ex. 6 at 258. At this time, she stated that it felt like the vaccine needle hit her bone. *Id.* It is somewhat difficult to understand why Petitioner would neglect to mention something as dramatic as a needle hitting her bone at her initial treatment appointments, but recall it months later. Nevertheless, this record does provide *some* evidence that could suggest onset within the time set forth in the Table, in addition to Petitioner's affidavit evidence.

Given the closeness of this evidentiary dispute, both parties risk an adverse finding if the issue is presented to me for a ruling. Additionally, in light of Petitioner's relatively brief and conservative treatment course, damages for pain and suffering in this case would likely be modest. Therefore, the parties are encouraged to attempt informal resolution through negotiations.

Accordingly:

**Petitioner shall file, by no later than <u>Friday, July 18, 2025</u>, a status report providing an update on the parties' discussions, including whether and when Petitioner has served a demand.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
